Barry E. BAYER, RHD Investments, Inc., a South Dakota Corporation and Westport Lanes, Inc., a South Dakota Corporation, Plaintiffs and Appellants,

v.

EMPLOYERS REINSURANCE CORPORATION, a Missouri Corporation, Defendant and Appellee.

No. 14831.

Supreme Court of South Dakota.

Considered on Briefs May 21, 1985.

Decided March 26, 1986.

Thomas K. Wilka of Hagen & Wilka, Sioux Falls, for plaintiffs and appellants; Karen E. Bjerke of Hagen & Wilka, Sioux Falls, on brief.

Richard O. Gregerson of Woods, Fuller, Shultz & Smith, Sioux Falls, for defendant and appellee.

MORGAN, Justice.

Plaintiff-assignee Barry Bayer (Bayer) brought an action against Employers Reinsurance Corporation (Employers) alleging: (1) a breach of duty to defend the assignor, Williams Insurance Company (Williams); and (2) a breach of duty of good faith and fair dealing under the insurance contract with Williams. The trial court granted a summary judgment in favor of the defendant, Employers, and the plaintiff appeals. We affirm.

The insurance contract subject to the dispute is an errors and omissions policy issued by Employers to Williams covering conduct of business as general agents, insurance agents, or insurance brokers. Williams is a wholly owned subsidiary of Sioux Agency, Inc. Greg Heineman (Heineman) and Roger Larsen (Larsen) are officers and stockholders of Sioux Agency, Inc. and Williams and were named as defendants in the underlying action. The errors and omissions policy was taken out in 1977. A question on page 2 of the application filled out at that time asked:

Are you engaged in any other business or profession? Explain in detail. Answer should also include reference to operation, if any, as insurance department of bank, savings and loan, mortgage institution, realty property management firm, auto dealership, etc.

Williams answered "No." Even though renewal applications were filled out, Williams did not notify Employers of any expansion of the scope of the services they offered to their customers.

Sometime prior to the transaction underlying this lawsuit, a decision was made within the corporate structure of Sioux Agency, Inc. and Williams that they would enter the business of arranging financing and charge a fee for those services. In order to insure collection of the fees they were going to charge for their services as mortgage brokers, Larsen obtained a mortgage broker's license.* Larsen admitted in his deposition that his license to sell insurance or as a broker did not entitle him to operate as a mortgage broker. He stated that he needed a separate license to collect fees as a mortgage broker. Williams did not carry separate insurance to cover their activities as a mortgage broker and they never notified Employers of their activities. Williams had a customary fee for their services as a mortgage broker. Larsen stated in his deposition that they charged "$2500 up front money just to eliminate those people that were not serious, and two percent or 2 points."

The seeds of this lawsuit were sown in the abortive efforts of Bayer to secure financing for a proposed bowling establishment through the efforts of officers and employees of Williams who, at the time, were holding themselves out as mortgage brokers and were indeed licensed to do so. They charged a fee of $2,500 up front and 2% or two points on the amount secured.

The machinations that follow sound like a script from a TV movie. Very succinctly, they boil down to this: Bayer was first put in touch with Al Cochran (Cochran), an Iowa insurance man who was also in the business of arranging financing for commercial buildings; the Williams people had a financial arrangement with Cochran involving sharing the $2,500 up-front money and splitting the 2% commission with Cochran. Bayer was next introduced to Joseph Lamonica of New York City, who allegedly had union connections and who agreed to arrange a loan from union pension and profit-sharing funds at 9.5% annual interest rate. Then the source of the financing was

---

* Because the people in the Williams office were licensed to sell several types of insurance and for other activities, the cost of licensing every- one for each activity was prohibitive. They felt it was adequate if one or two held licenses under which they could all work.

switched to a bank in Antigua and Bayer was required to put up $150,000 as equity to secure a 100% loan of $1.5 million. Bayer signed a note and mortgage for $1.5 million and wired $150,000 to the bank in Antigua, which turned out to be an attorney's office. The money was never seen again. After a two-year delay, Bayer secured financing for his bowling alleys through First Bank of Sioux Falls at a 19% annual interest rate.

Bayer filed an action against Larsen, Heineman, Williams Insurance, Cochran, and Lamonica, alleging (1) breach of contract; (2) negligence; (3) misrepresentation; and (4) fraud and deceit. Bayer sought damages, including the $2,500 paid to Williams, the $150,000 telexed to Antigua, for lost profits during the construction delay, for the difference between the 9.5% interest promised and the 19% he was eventually required to pay First Bank of Sioux Falls, for other sums which he was required to pay and costs incurred in attempting to secure the financing, for attorney fees in defense of a foreclosure action and for his action against Larsen, Heineman, Williams, Cochran, and Lamonica, and for $500,000 punitive damages for the fraudulent and deceitful acts of those defendants.

Larsen, Heineman and Williams tendered their defense to Employers under the errors and omissions policy. Employers notified them that it declined to defend for the reason that the policy did not cover the acts alleged in Bayer's complaint. Larsen and Heineman then entered into a settlement agreement with Bayer. Of the $700,000 to $800,000 Bayer sued for, he settled for $260,000. That figure was reducible to $175,000 if the latter amount was paid by a specific date; however, the amount was never paid on that portion of the settlement. Under another portion of the settlement, Heineman, Larsen, and Williams loaned Bayer $50,000 which Bayer was to pay back in three installments only in the event that he recovered at least $60,000 in the present action against Employers. Larsen and his attorney admitted that the settlement was entered into "principally for

the purpose of assigning that claim against the insurance company." Bayer then filed this action.

Bayer first defines the issue before us as follows: Does an insurer have a duty to defend under an errors and omissions policy for an action brought against its insured for losses arising out of the performance of soliciting insurance sales by attempting to secure financing for an insurance client? Employers phrases the issue as follows: Do acts undertaken to secure financing on behalf of another constitute conduct of the business of the agency, "as general agent, insurance agent, or insurance broker?" In his reply brief, Bayer rephrases the issue to be: The trial court erred in granting defendant's motion for summary judgment because the defendant had a duty to defend the action brought by plaintiff from the loss arising out of the performance of the services of Larsen and Heineman in their capacity as insurance agents or insurance brokers.

■ We first examine the parameters of the duty of an insurer to defend. In *Hawkeye-Security Ins. Co. v. Clifford*, 366 N.W.2d 489 (S.D.1985), we did so in the context of a declaratory judgment action by the insurer to determine its duty. We first noted that the duty to defend and the duty to pay are severable and independent duties and the duty to defend is much broader than the duty to pay. *Id.* at 490. We recognized the rule as promulgated by the United States Court of Appeals for the Eighth Circuit in *U.S. Fidelity & Guaranty Co. v. Louis A. Roser Co.*, 585 F.2d 932 (8th Cir.1978):

> It is the general rule that the duty of an insurance company to defend its insured is to be determined by the allegations of the complaint or petition in the action brought against the insured. An insurer must defend its insured if the pleadings in the action against the insured allege facts which, if established, would support a recovery under the policy.

*Hawkeye-Security*, 366 N.W.2d at 491. We then extended that rule to cover in-

stances where the pleadings were ambiguous, as they were in *Hawkeye-Security,* to require that "if it is clear or arguably appears from the face of the pleadings in the action against the insured that the alleged claim, if true, falls within policy coverage, the insurer must defend." 366 N.W.2d at 491. Finally, we stated that the burden of showing no duty to defend rests on the insurer who must show the claim clearly falls outside of policy coverage. *Id.* at 492.

In *Black Hills Kennel Club v. Firemens' Fund Indemnity Co.,* 77 S.D. 503, 506–507, 94 N.W.2d 90, 92 (1959), we noted that

> [t]he scope of liability insurance is determined from the contractual intent and objectives of the parties as expressed in the policy.... We are mindful of the rule of construction that where the provisions of an insurance contract are not clear and are fairly susceptible of different interpretation that one most favorable to the insured should be adopted.... This rule does not mean, however, that the court may seek out a strained or unusual meaning for the benefit of the insured.... Insurers may assume some risks and exempt themselves from liability for others.

We further held in *Black Hills Kennel Club* that where

> [t]he policy provides that as respects insurance afforded by the policy the insurer shall defend any suit against the insurer alleging injury and seeking damages on account thereof even though groundless, false or fraudulent. The insurer was not obligated to defend an action based on a claim outside the coverage of the policy.

77 S.D. at 508, 94 N.W.2d at 93.

Against the background of the law regarding the duties of an insurance company to defend as we have analyzed it above, we then turn to the issue of the propriety of the trial court's granting summary judgment in favor of Employers.

On appeal, our scope of review is to determine whether there is any genuine issue as to any material fact. *Laber v.*

*Koch,* 383 N.W.2d 490 (S.D.1986). In *Laber,* we delineated the guidelines as found in *Wilson v. Great Northern Railway Co.,* 83 S.D. 207, 157 N.W.2d 19 (1968).

> (1) Evidence must be viewed most favorable to the non-moving party;
>
> (2) The burden of proof is on the movant to show clearly that there is no genuine issue of material fact and that he is entitled to judgment as a matter of law;
>
> (3) Summary judgment is not a substitute for a court trial or for trial by jury where any genuine issue of material fact exists;
>
> (4) Surmise that a party will not prevail upon trial is not sufficient basis to grant summary judgment on issues which are not shown to be sham, frivolous, or so unsubstantial that it is obvious that it would be futile to try them;
>
> (5) Summary judgment is an extreme remedy which should be awarded only when the truth is clear and reasonable doubts touching the existence of a genuine issue as to material fact should be resolved against movant;
>
> (6) When no genuine issue of fact exists, summary judgment is looked upon with favor and is particularly adaptable to expose sham claims and defenses.

*Laber,* 383 N.W.2d at 491–92.

As is apparent from Bayer's manner of framing the issue, it is his earnest contention that Williams' acts in attempting to secure financing for his enterprise was merely incidental to solicitation of Bayer's insurance business and therefore an issue exists whether there was coverage under the errors and omissions policy as written. The trial court disagreed and so do we.

■ Granted, for the sake of this argument, that Williams had in the past acted to assist prospective customers in getting financing in hopes of writing their insurance, and granting that other insurance agents have done likewise, it is an undisputed fact that Williams had clearly gone into the

business of mortgage brokering, had established a fee schedule, $2,500 up front and two points, and to insure their ability to collect such fees, had secured licensing to engage in the business. Williams had entered into an agreement to secure the financing for Bayer who paid them $2,500 up front and upon completion of the proposed deal would have been required to pay an additional $30,000.

The qualifications and licensing of insurance brokers, agents and solicitors is covered under SDCL ch. 58–30 and the licensing authority is currently vested in the Director of the Division of Insurance of the Department of Commerce and Consumer Affairs. Mortgage brokering on the other hand is covered under SDCL ch. 36–21, Real Estate Brokers and Salesmen, and the licensing authority thereunder is the South Dakota Real Estate Commission.

We affirm the judgment of the trial court.

All the Justices concur.

SABERS, J., not having been a member of the Court at the time this action was submitted to the Court, did not participate.